**SO ORDERED.**

**SIGNED this 12th day of May, 2017.**



_____
Robert E. Nugent
United States Bankruptcy Judge
_____

DESIGNATED FOR ONLINE PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE:<br><br>PAUL WAYNE KIMBALL<br><br>     Debtor. | Case No. 07-12276<br>Chapter 11 |
| PAUL WAYNE KIMBALL,<br><br>     Plaintiff,<br>vs.<br><br>UNITED STATES SMALL BUSINESS ADMINISTRATION, and FRONTIER FINANCIAL PARTNERS, INC., f/k/a EASTERN KANSAS ECONOMIC DEVELOPMENT GROUP, INC.,<br><br>     Defendant. | Adv. No. 16-5105 |

1

# ORDER DENYING MOTION FOR SUMMARY JUDGMENT

When a debtor assigns a life insurance policy as collateral for a loan, the creditor has a lien on the policy's benefits and the debtor has a reversionary interest in the policy's surrender value or other benefits that remain after the debt it secures has been paid. The debtor's policy, subject to the assignee's collateral interest, becomes property of the chapter 11 estate on the petition date. If the confirmed plan doesn't specifically provide for a creditor to retain its lien, and if the creditor has had a meaningful opportunity to participate in the case, the lien is extinguished when the policy revests in the debtor at confirmation.[1]

Paul Kimball granted Eastern Kansas Development Group ("EKD") a second mortgage on real estate and a convenience store in Ottawa, Kansas. The United States, acting through the Small Business Administration ("SBA") guaranteed the EKD loan. As further security, Kimball executed a collateral assignment of his $700,000 Aid Association for Lutherans (now known as "Thrivent") life insurance policy to EKD and SBA. EKD assigned its interest in the loan documents to the SBA. After Kimball filed for chapter 11 relief in 2007, and before his plan was confirmed, Kimball sold the real estate free and clear of liens pursuant to court order. After distributing the costs of sale, he paid the first mortgage holder in full and EKD/SBA the balance of the proceeds. Kimball's plan proposed that the first lender and EKD/SBA would retain the funds at confirmation in complete satisfaction of their claims. SBA failed to object and the plan was confirmed. SBA now claims that

---

[1] 11 U.S.C. § 1141(c).

2

Kimball's life insurance policy assignment to it was absolute.

Kimball sues for a declaration that the Thrivent policy is his free and clear; the SBA seeks summary judgment.[2] The summary judgment record reflects that the policy collateral assignment was conditional and not absolute. Because Kimball's plan did not provide for SBA to retain its lien, the collateral assignment was extinguished at confirmation and the policy revested in Kimball as the plan's terms and § 1141(c) provide. Summary judgment must be denied.[3]

Facts

The facts in this matter are generally uncontroverted. In April of 2003, Kimball and two other individuals executed an $830,000 note to the Eastern Kansas Economic Development Group, Inc. As collateral for the loan, the three granted EKD a second mortgage in real estate and the convenience store thereon in Ottawa, Kansas. Several related entities also guaranteed the loan's repayment. Then, on April 25, 2003, EKD assigned its interest in this loan and collateral documents to the SBA. After that, Paul Kimball executed an assignment of the Thrivent life insurance policy to "US Small Business Administration/ assign Eastern Kansas Economic Development" on May 6, 2003.

---

[2] Adv. Doc. 27.
[3] Plaintiff Paul Kimball appears by his attorney J. Michael Morris of Klenda Austerman, LLC and the defendant Small Business Administration appears by Michelle A. Jacobs, Assistant United States Attorney for the District of Kansas. The other defendant in this proceeding does not appear; default judgment has been entered against it determining that it has no interest in the subject life insurance policy. Adv. Doc. 13.

3

The assignment is titled "Assignment of Life Insurance Policy as *Collateral*" (the "Assignment").[4] It provides that the assignee will possess the "sole right" to collect on or surrender the policy, but also says that "this assignment is made and the Policy is to be *held as collateral security* for any and all liabilities of [the assignor] … to the Assignee …."[5] Moreover, the assignee covenants that any sums remaining from the funds received from Thrivent after the loan has been paid in full will be returned to the assignor "had this assignment not been executed" and, further, that the Assignee will not exercise the right to surrender the policy or borrow on it unless and until the assignor defaults on the note or allows the premiums to lapse.[6] The assignor retained the right to change beneficiaries.[7]

In 2007, Kimball filed this chapter 11 case, listing both EKD and SBA as creditors. He also listed the real estate in Ottawa as collateral for their debt, but did not note that the Thrivent policy had been assigned as collateral. Instead, on amended Schedule B, Kimball listed two Thrivent policies, one a term policy and the other a permanent life policy with $90,000 surrender value. He claimed both as exempt on Schedule C. SBA's proof of claim, filed in November of 2007, omitted the Assignment.[8] It only attached EKD's April 25, 2003 assignment of the note and related collateral instruments to the SBA. That document was executed before

---

[4] Adv. Doc. 27-1, pp. 12-13. Emphasis added.
[5] *Id*. at p. 12, ¶s B, D. Emphasis added.
[6] *Id*. at p. 12, ¶ E,
[7] *Id*. at p. 12, ¶ C.2.
[8] *See* Claim No. 3-1 in total amount of $780,370, with $289,865 secured by real estate and $490,505 unsecured.

4

Kimball assigned the Thrivent policy.[9]

During the case, Kimball, as debtor in possession, sought an order to sell the convenience store and real estate free and clear of liens under to 11 U.S.C. § 363(f).[10] After paying the costs of sale and satisfying the first mortgage, Kimball paid the remaining $289,865.91 to SBA which had since been assigned EKD's position in the priority of claims to the proceeds. In 2008, Kimball filed a chapter 11 plan that provided for the SBA to retain the net sale proceeds, but "*not retain a lien on any property*," and the balance of the [SBA] claim will be unsecured.[11] SBA did not object to the plan and it was confirmed on October 22, 2008.[12]

Recently, the SBA reasserted either a lien or ownership interest in the Thrivent policy by virtue of the Assignment. Kimball reopened his bankruptcy case in 2016 so he could file this adversary proceeding seeking a declaration that the SBA's lien on the policy was extinguished by confirmation of the plan. The SBA moves for summary judgment.

Analysis

To prevail on summary judgment, the SBA must show that there are no disputed material facts and that it is entitled to judgment as a matter of law.[13] In the

---

[9] *Id.* at pp. 11-12. The Thrivent policy Assignment was not executed until May 6, 2003.
[10] Doc. 16, 43.
[11] Doc. 132, p. 6.
[12] Doc. 155.
[13] Fed. R. Civ. P. 56(a) (summary judgment shall be granted if movant shows no genuine dispute of any material fact "*and* the movant is entitled to judgment as a matter of law.").

5

absence of any material factual controversy, we focus on the legal aspect of the SBA's argument--whether those undisputed material facts establish as a matter of law that the SBA's position is correct.[14] Federal procedure Rule 56 governs the standards for granting summary judgment, but Kansas substantive law governs the interpretation of the Assignment.[15]

The SBA argues that the Assignment divested Kimball of any of his rights or interest in the policy in 2003 before he filed his bankruptcy. Because he didn't own any part of it when he filed, the policy never became property of the estate and it could not have revested in him at confirmation. Even if it were property of the estate, the SBA's lien on it "rode through" the bankruptcy case and survived Kimball's discharge. This argument rises or falls on whether the Assignment is conditional or absolute.

Kansas law permits life insurance policies to be assigned,[16] and security interests in life insurance policies are excluded from the ambit of Article Nine of the UCC.[17] As one commentator states—

> Most assignments of life insurance contracts are made for the purpose of providing additional security in a loan transaction. Such assignments as security for creditors are called conditional assignments,

---

[14] Even if there are no factual controversies, the movant must demonstrate that those facts entitle it to summary judgment under the applicable law. *See Clifton v. Craig,* 924 F.2d 182, 183-84 (10th Cir.1991) (if material facts are not in dispute, "we must next determine if the substantive law was correctly applied."); *Black v. Baker Oil Tools, Inc.,* 107 F.3d 1457, 1460 (10th Cir. 1997).
[15] *Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.,* 938 F.2d 1105, 1106 (10th Cir. 1991) (federal procedural law prescribes standard of review of summary judgment but state substantive law governs contract interpretation issues).
[16] KAN. STAT. ANN. § 40-439 (2000).
[17] KAN. STAT. ANN § 84-9-109(d)(8) (2016 Supp.).

6

> or more commonly, collateral assignments. Ordinarily only part of the ownership rights are transferred, and seldom the right to change the beneficiary, and always on condition that upon payment of the debt the rights return (or revert) to the owner-assignor.
>
> * * *
>
> An absolute assignment (sometimes called a change of ownership) transfers ownership to the assignee and empowers the assignee to change any revocable beneficiary.[18]

Generally, no particular words or special form of words are necessary to effect an assignment of a life insurance policy. A valid assignment must evidence an intent to transfer rights, describe the subject matter of the assignment, must be clear and unequivocal, and noticed to the obligor-insurer.[19] A careful review of the assignment form used in this case makes clear that Kimball's was a collateral or conditional assignment and not absolute. Courts also hold that collateral assignees are only entitled to recover their debt from the policy; what remains of the policy benefit after payment of the debt is payable to the insured, or if the insurable event has occurred, the beneficiaries.[20]

The Assignment states that Kimball "assigns, transfers, and sets over" the policy to SBA, except as provided in Paragraph C.[21] Paragraph B of the Assignment catalogues the rights the assignee takes under the Assignment,[22] while Paragraph C

---

[18] Franklin L. Best, Jr., 1 LIFE & HEALTH INSURANCE LAW, Ch. 11.E, § 11:13 (2016 ed.).
[19] *Johnson County Bank v. Ross,* 28 Kan. App. 2d 8, 11, 13 P.3d 351 (2000) (interpreting whether bank "filed" collateral assignment with the insurer).
[20] *See Balcer v. Peters*, 37 Mich. App. 492, 495, 195 N.W.2d 83, 85 (1972).
[21] Doc. 27-1, p. 12, ¶ A.
[22] *Id.* at p. 12, ¶ B.

7

lists the rights or interests under the policy that were "reserved or excluded" from the Assignment and "do not pass."[23] The rights assigned include the "sole right" to collect on the policy when "it becomes a claim by death or maturity," to surrender the policy and receive its cash value, and to collect and receive all distributions or dividends.[24] But Paragraph E conditions the assignee's exercise of these rights on occurrence of a default on the liabilities the Assignment secures or a failure to pay the premiums.[25] It also provides—

> That any balance of sums received hereunder from the Insurer remaining after payment of the then existing Liabilities, matured or unmatured, shall be paid by the Assignee to the persons entitled thereto under the terms of the policy….[26]

Thrivent's Acknowledgment of the assignment states in part—

> Release of assignment forms are enclosed. When the assignment has been satisfied, complete the release form and mail it to us [Thrivent]….[27]

Kimball retained the ownership right to designate and change policy beneficiaries.[28]

The terms of this Assignment and the acknowledgment make clear that it was made as collateral and was not absolute. Paragraph D plainly states the Assignment "is made and the Policy is to be held as collateral security for any and all liabilities of the undersigned . . . to the Assignee …." Had this been an absolute assignment, Kimball would have retained no rights. He would have had no right to receive any

---

[23] *Id.* at p. 12, ¶ C.
[24] *Id.* at ¶ B.1, B.2, B.4. .
[25] *Id.* at ¶ E.2.
[26] *Id.*at ¶ E.1.
[27] *Id.* at p. 15 ¶ 2.
[28] *Id.* at p. 12, ¶ C.2. Thrivent's Acknowledgement of the Assignment also recognized Kimball's right to change the beneficiary at any time. Doc. 27-1, p. 15, ¶ 3.

8

surplus remaining after the debt it secured was paid. Nor would there have been a need for a release provision. I conclude that the Assignment was, as its title suggests, collateral only.

Section 1141(c) provides that estate property that revests in the debtor at confirmation comes "free and clear" of any creditor's interests. But for that property to be cleansed of its liens, it must be "dealt with by the plan." Though Kimball's plan didn't explicitly mention the life insurance policy, its language suggests that the Assignment and the policy were indeed "dealt with." The plan's provisions that relate to this claim include Article 3, "Classification of Claims," which provides that the SBA claim will be treated as a Class 3 claim and the treatment provisions in Article 6 relating to the claim as set out here:

> Class 3. Eastern Kansas Development Group, Inc. ("EKD") and Small Business Administration ("SBA") were secured with a second mortgage in the convenience store property (2518 E. Logan) in Ottawa, Kansas. The first mortgage was held by Security Savings Bank ("SSB") (see Class 4 below). This property was sold post-petition and net funds after the SSB claim paid to EKD/SBA on their secured claim. SBA has filed a proof of claim for $780,370.74, consisting of $490,504.83 unsecured and $289,865.91 secured. This secured amount is believed to represent funds paid from the estate. *EKD/SBA will retain the $289,865.91 received from the sale, as described above. The balance of the claim will be unsecured (see Class 5 below). Neither EKD nor SBA will otherwise retain a lien on any property.*[29]

Kimball treated SBA's claim as impaired and provided that SBA would retain the sale proceeds of the Ottawa real estate and convenience store, but that the remainder of its claim would be unsecured--it would retain NO lien on any other

---

[29] Doc. 132, pp. 5-6. Emphasis added.

9

property. While there is no specific mention of the insurance policy or the Assignment in the plan, it clearly stipulates that SBA would retain no other liens. The docket in the bankruptcy case shows that the United States entered its appearance for the SBA in 2007, long before the plan was confirmed. The confirmation order reflects that only one secured creditor, Midland Bank, objected to confirmation. SBA therefore entered an appearance, filed a claim (without mentioning or including a copy of the Assignment), and stood mute in connection with confirmation. Only now, years after confirmation, does SBA assert a continuing interest in the Thrivent life insurance policy.

SBA's argument that its interest in the policy passed through confirmation unchanged and remains effective relies principally on *Estate of Lellock v. Prudential Insurance Company of America*, a Third Circuit case that construed an insurance assignment as having passed the "property interest" to the creditor and further held that the creditor's interest had passed through the assignor's chapter 7 case intact, even after the assignor received a discharge.[30] *Lellock* is unhelpful here for two reasons. First, the *Lellock* assignment was "absolute and transferred to the National Bank 'all rights, benefits, and advantages to be had or derived therefrom including, without limiting the generality of the foregoing, the right at any time to exercise the loan provisions thereof or to surrender the same for its cash value even though the assignment may be for collateral security only.'"[31] Second, and perhaps more

---

[30] 811 F.2d 186 (3rd Cir. 1987).
[31] 811 F.2d 186, 187.

10

important, the *Lellock* chapter 7 discharge simply did not prevent the enforcement of a prepetition lien on the property.[32] There is no analog to § 1141(c) in chapter 7 to cleanse property of untreated liens in the hands of the reorganized debtor. In chapter 7, liens, even those on exempt property, survive discharge and remain enforceable afterward.[33]

Section 1141(c) varies the effect of §§ 506(d) and 522, changing the outcome for successfully-reorganized chapter 11 debtors. The confirmation of a chapter 11 plan frees property that is dealt with in the plan from liens after confirmation unless the plan provides for those liens to be retained. In *In re Penrod*, the Seventh Circuit Court of Appeals held that "the default rule for secured creditors who file claims for which provision is made in the plan of reorganization is extinction and is found in the Code itself."[34] In that case, a farmer borrowed money for his hog operation secured by a lien on his livestock. The bankruptcy court confirmed a plan that simply provided for the lender to be paid in full, but did not provide for the lender to retain its lien. When the hogs became ill, the debtor sold them for slaughter, prompting the lender to attempt to enforce its lien in state court. When the farmer claimed the lien had been extinguished by operation of § 1141(c), the bankruptcy and district courts agreed. After framing the issue before it as "whether preexisting liens survive a reorganization when the plan (or the order confirming it) does not mention the liens,"

---

[32] *Id*. at 188-89.
[33] *See Chandler Bank of Lyons v. Ray*, 804 F.2d 577, 579 (10th Cir. 1986) (unavoided liens pass through § 506(d) without action by the lien holder). *See also* § 522(c)(2).
[34] 50 F.3d 459, 462 (7th Cir. 1995).

11

the Seventh Circuit affirmed, holding that "unless the plan of reorganization, or the order confirming the plan, says that a lien is preserved, it is extinguished by the confirmation… provided, we emphasize, that the holder of the lien participated in the reorganization."[35] Like other courts, *Penrod* states that while liens pass generally through bankruptcy unaffected, if they are brought into a chapter 11 case, and if the lienholder has an opportunity to participate in the reorganization, they are extinguished by § 1141(c). Several other courts have similarly held.[36]

The Tenth Circuit Court of Appeals recognized § 1141(c)'s power in *In re Barton Indus., Inc.*[37] There, a premium financier, TIFCO, retained its lien on return premiums earned post-petition by a debtor when it cancelled insurance coverage. The debtor made no attempt to treat the TIFCO's lien or claim in the plan, nor did it mention the return premiums. Because the debtor did not give sufficient notice to the lender concerning its specific treatment, the Tenth Circuit reasoned that the liens on the return premiums survived confirmation.[38]

In a case similar to ours, *In re Martin*, the debtor assigned a life insurance policy to the Production Credit Association (PCA) as collateral for a well-secured loan. When the debtors filed chapter 12 and the insured died, PCA and the widow settled. Then she proposed, and the court confirmed, a plan that did not preserve PCA's lien

---

[35] *Id.* at 462-63.
[36] *See In re Regional Bldg. Systems, Inc.*, 254 F.3d 528, 531 (4th Cir. 2001); *Fed. Dep. Ins. Co. v. Union Entities (In re Be-Mac Transport Co.),* 83 F.3d 1020 (8th Cir.1996).
[37] *Am. Bank and Trust Co. v. Jardine Ins. Services Texas, Inc. (In re Barton Indus., Inc.),* 104 F.3d 1241 (10th Cir. 1997).
[38] 104 F.3d 1241, 1245-46.

in the life insurance policy. The court held that the debtors "continue to have a contingent entitlement to any amount of proceeds" that remained property of the estate.[39] Because the chapter 12 plan failed to provide for PCA to retain its lien in the policy or its proceeds, they passed to the debtor free and clear of PCA's claims.[40]

Kimball's plan explicitly treated SBA's claim by limiting its secured interest to the sale proceeds of the Ottawa real estate and unequivocally stating that SBA would retain no lien on "any other property." It can hardly be said that SBA was deprived of an opportunity to "participate" in the reorganization. SBA filed a proof of claim without referencing the policy Assignment as collateral, entered its appearance in the case, acquiesced in the § 363(f) sale of its real estate collateral in Ottawa, and allowed the plan to be confirmed without objection. It had ample notice and opportunity to challenge the treatment of its claim but, for whatever reason, did not.

Based on the summary judgment record, we conclude that, as a matter of law, the Thrivent policy Assignment was a collateral assignment, and the only SBA interest that survived confirmation of Kimball's plan was SBA's right to retain the sale proceeds of the Ottawa real estate by virtue of its second mortgage. Any remaining interest it may have had in the Assignment or the Thrivent policy was extinguished when the policy passed to the reorganized debtor upon confirmation under § 1141(c). The SBA's motion for summary judgment is therefore denied. This proceeding remains set for trial May 23, 2017 at 9:00 a.m.

---

[39] *In re Martin*, 130 B.R. 951, 963 (Bankr. N.D. Iowa 1991).
[40] *See* 11 U.S.C. § 1227(a), (c).

# # #